# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

CALLIE D. GUTHRIE,

　　　　　　*Plaintiff-Appellant,*

v.

NATIONAL RURAL ELECTRIC
COOPERATIVE ASSOCIATION LONG-
TERM DISABILITY PLAN; COOPERATIVE
BENEFIT ADMINISTRATORS,
INCORPORATED,

　　　　　　*Defendants-Appellees.*

No. 06-1410

Appeal from the United States District Court
for the Eastern District of North Carolina, at Greenville.
Malcolm J. Howard, Senior District Judge.
(4:04-cv-00182-H)

Argued: September 25, 2007

Decided: December 11, 2007

Before KING and GREGORY, Circuit Judges, and
Samuel G. WILSON, United States District Judge for the
Western District of Virginia, sitting by designation.

---

Reversed and remanded with instructions by published opinion. Judge
Gregory wrote the opinion, in which Judge King and Judge Wilson
joined.

---

## COUNSEL

**ARGUED:** Andrew O. Whiteman, HARTZELL & WHITEMAN,
L.L.P., Raleigh, North Carolina, for Appellant. John Jay Range,

HUNTON & WILLIAMS, Washington, D.C., for Appellees. **ON BRIEF:** Elena E. Ellison, HUNTON & WILLIAMS, Richmond, Virginia, for Appellees.

---

## OPINION

GREGORY, Circuit Judge:

Callie D. Guthrie ("Guthrie") was denied long-term disability benefits ("LTD benefits") by her employee benefit plan. She brought suit against Cooperative Benefit Administrators, Inc. ("CBA") under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). CBA moved for summary judgment. The District Court granted CBA's motion for summary judgment and denied Guthrie's motion for summary judgment, holding that no genuine issue of fact supported Guthrie's disability claim. Because we find that CBA failed to consider all of Guthrie's medical ailments in denying her claim for disability benefits, we reverse and remand.

I.

Guthrie is a 57 year old former employee of Harkers Island Electric Membership Corporation ("HIEMC") where she worked as a custodian for 13 years. HIEMC is a member of the National Rural Electric Cooperative Association ("NRECA"). NRECA, a non-profit corporation, is a national trade association for rural electric cooperatives. NRECA sponsors a Group Benefits Program which provides disability, life, accident, medical and other welfare benefits plans.[1] HIEMC along with more than 1,000 other rural electric cooperatives participates in the Group Benefits Program. The Group Benefits Program is administered by NRECA's wholly-owned subsidiary, CBA.

On March 23, 2002, Guthrie took disability leave from HIEMC. Shortly thereafter on May 6, 2002, she filed a claim for LTD benefits. Guthrie claimed to have breathing problems which prevented her

---

[1]The Group Benefits Program is a single plan of welfare benefits as defined in section 3(1), 29 U.S.C. § 1002(1) of ERISA.

from working in an environment using cleaning products. She also claimed to suffer from carpal tunnel syndrome, arthritis in her knees, asthma, sores on her skin, depression and anxiety, unsteady gait, poor vision, obesity, high blood pressure, and high cholesterol. Guthrie's primary care physician, Dr. T.L. Goodman ("Dr. Goodman"), confirmed her ailments. Dr. Goodman concluded that Guthrie was totally disabled because her breathing prevented her from working around dust, cleaners, and humidity. He noted, however, that Guthrie was not totally disabled from other employment.

HIEMC's Groups benefits program includes a long-term disability plan ("LTD Plan") that provides benefits to employees. HIEMC contributes to a trust fund held by NRECA for the payment of administrative expenses, insurance company premiums, and benefits. Under the terms of the LTD Plan a participant is considered "totally disabled" if due to sickness or accidental bodily injury he or she is: (1) completely unable to perform any and every duty pertaining to his own occupation, and (2) after two years, completely unable to engage in any and every gainful occupation for which he is reasonably fitted by education, training, or experience. On June 13, 2002, CBA approved Guthrie's claim for benefits under the LTD Plan's "own occupation" standard.

After receipt of benefits, Guthrie says her health continued to deteriorate. Although she underwent surgery for carpal tunnel, the surgery did not completely relieve her pain. She continued to experience problems with her knees, left wrist, hand, and cholesterol.

In support of her disability claim, Guthrie submitted medical records from her treating physicians to CBA. Dr. Goodman, Dr. C. Hugh Everhart, a pulmonologist, and Dr. Matthew L. Zettle, an orthopedist, all agreed that Guthrie could not work as a custodian due to exposure to fumes, solvents and dust. But none concluded that she lacked the capacity to perform other work.

Based on these medical reports, CBA referred Guthrie to Intracorp, an employability assessment company. After interviewing Guthrie and reviewing her medical files, Intracorp concluded that Guthrie faced several barriers to future employment including, the lack of a high school diploma and limited transferable skills. Intracorp noted

that Guthrie would need to learn how to develop a resume and inter-view; but could perform sedentary or light duty jobs.[2]

Intracorp provided a job list, with descriptions, to Guthrie's physicians and requested that they "indicate which positions would be physically and mentally appropriate." Dr. Zettle approved the list. Dr. Everhart confirmed that all the jobs were appropriate so long as Guthrie was not exposed to excessive dust or fumes. Dr. Goodman claimed that none of the jobs were appropriate. Because Dr. Goodman previously agreed that Guthrie could perform other work, Intracorp asked Dr. Goodman to explain his new diagnosis. In response, he stated that he previously failed to consider Guthrie's other medical conditions: asthma, chronic nasal congestion, gastroesophageal reflux syndrome, obesity, hypertension, osteoarthritis, carpal tunnel syndrome, and IQ. Taking all this into account, Dr. Goodman opined that while Guthrie could physically perform some of the positions, she could not "function" in any of the jobs.

In January 2003, Intracorp reevaluated Guthrie and determined that despite having below average math, reading, and language skills she could perform unskilled sedentary jobs such as ticket taker, cashier, hostess, textile tagger, and photo finishing lab worker. Intracorp provided Guthrie's assessment to Dr. Goodman. He agreed that Guthrie could physically perform a few of the jobs.

From February 2003 to June 2003, Intracorp says it provided Guthrie with numerous job leads and assured her that "if a job was offered, Dr. Goodman would be contacted to ensure she was physically able to perform the job duties." (J.A. 224.) However, according to Intracorp, Guthrie often unnecessarily and negatively explained her medical conditions to potential employers.

During this same time, Guthrie says her health deteriorated even further. Dr. Goodman noted that Guthrie continued to have very sig-

---

[2]Intracorp identified the following jobs: document preparer, microfilming, reviewer, addresser, taxicab coordinator, telephone solicitor, call-out operator, order clerk for food and beverage, charge account clerk, dispatcher of motor vehicles, ticket taker, file clerk, and library assistant. (J.A. 235-38.)

nificant medical problems. He reported that she had rather significant musculoskeletal symptoms, very prominent anxiety, depression, "is frequently tearful," and severe dermatological lesions that in some ways were making her unemployable. James E. Lauve ("Lauve"), a board-certified clinical social worker, also evaluated Guthrie. Lauve diagnosed Guthrie as suffering from major depression and anxiety and concluded that her physical and mental state precluded work areas commensurate with her experience, education and physical capabilities.

On January 22, 2004, CBA informed Guthrie that her benefits under the "own occupation" standard would expire on June 22, 2004, and that it was reviewing her disability status. Dr. Goodman submitted another evaluation along with current medical records. He reiterated that Guthrie could not perform any job due to her mental and physical constraints.

Virginia Parks ("Parks"), a CBA nurse analyst, reviewed Dr. Goodman's report and the medical records and determined that Guthrie's medical problems remained relatively unchanged.

On May 24, 2004, CBA informed Guthrie that it would not renew her LTD benefits because her medical evidence demonstrated that she could obtain other gainful employment and, therefore, was not disabled under the "any occupation" standard. Guthrie appealed and requested that CBA consider her award of social security benefits.

On July 30, 2004, Guthrie petitioned CBA's Appeals Committee. In support, she provided letters from Dr. Goodman and Dr. James M. Zechman ("Zechman"). Dr. Goodman stated he continued to follow Guthrie's osteoarthritis, severe dermatitis, asthma with an occupational component, esophageal disease, hyperlipidemia, and hypertension and that these conditions rendered her disabled from any occupation. Dr. Zechman, board-certified in allergy and immunology, also concluded that Guthrie has occupational asthma, which he considered a permanent disability.

CBA submitted Dr. Zechman's report to ProPeer for a second independent review. Dr. Leonard Sonne ("Sonne"), a board-certified pulmonologist, reviewed the report along with Guthrie's medical files.

Sonne agreed that Guthrie had mild asthma, depression, and arthritis but that there was "no documentation to substantiate any disability from sedentary work, light work, or medium work." (J.A. 47-48).

On September 30, 2004, the Appeal Committee denied Guthrie's claim for LTD benefits. Guthrie then filed suit in the United States District Court for the Eastern District of North Carolina. Guthrie sought, *inter alia*, reinstatement of benefits under 29 U.S.C. § 1132(g). On cross-motions for summary judgment, the District Court found that CBA did not abuse its discretion in denying Guthrie LTD benefits under the "any occupation" standard because there was substantial evidence in the record demonstrating that Guthrie could perform sedentary jobs.

Guthrie challenges the district court's finding on two grounds: (1) the district court failed to apply a modified abuse of discretion standard of review in determining whether the denial of her benefits was supported by substantial evidence; and (2) the district court erred in holding that Guthrie's claim received a full and fair review pursuant to 29 U.S.C. § 1332(a) of ERISA.

## II.

When an ERISA claimant appeals a grant of summary judgment, the Court conducts a *de novo* review, applying the same standards that the district court employed. *Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997). A district court's determination of the proper standard for reviewing an ERISA plan administrator's decision is also reviewed *de novo*. *Colucci v. Agfa Corp. Severance Pay Plan*, 431 F.3d 170, 176 (4th Cir. 2005).

## III.

In the instant case, the first issue to resolve is the proper standard of review. It is well-settled that courts review the denial of benefits under an ERISA policy for "abuse of discretion" if the policy grants the administrator or fiduciary final and conclusive discretionary authority. *Carolina Care Plan Inc. v. McKenzie*, 467 F.3d 383, 386 (4th Cir. 2006). This standard is only modified when a beneficiary

demonstrates that the plan administrator has a conflict of interest. *Id*. The LTD Plan at issue grants the administrator full authority.[3] But Guthrie maintains that a conflict of interest exists because CBA is a subsidiary of NRECA. The district court disagreed and refused to apply the "sliding scale abuse of discretion standard."

In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), the Supreme Court set forth the standard of review in ERISA cases. The Court instructed lower courts to apply an abuse of discretion standard unless the administrator or fiduciary is operating under a conflict of interest. Then, "the conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Id.* at 115 (quoting Restatement (Second) of Trust § 187, cmt. d (1959)).

"Since *Firestone*, courts have struggled to give effect to [its] delphic statement, and to determine both what constitutes a conflict of interest and how a conflict should affect the scrutiny of an administrator's decision to deny benefits." *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 383 (3d Cir. 2000). Under the sliding-scale approach, the greater the administrator's conflict of interest, the less deference the reviewing court will give to the administrator's decision. *Carolina Care Plan Inc.*, 467 F.3d at 386 ("'[t]he more incentive for the administrator . . . to benefit itself,' the less a court defers." (quoting *Ellis*, 126 F.3d at 233)). However, a conflict of interest must exist.

HIEMC pays into a trust fund held by NRECA, a non-profit, who contracts with CBA, an independent third-party to administer the claims. (J.A. 460.) NRECA established a trust funded by thousands of participating employers solely to pre-fund the benefit claims of their employees and to spread the financial risk of paying a benefit claim. Neither NRECA or any of the employers have a reversionary interest in the funds. Benefit claims are paid from the trust — not CBA's, NRECA's, or any participating employer's own assets. Because CBA and NRECA maintain a parent-subsidiary relationship, Guthrie argues that a less deferential standard of review should apply.

---

[3]Section 9.07 of the LTD Benefit Plan grants "the Plan Administrator and CBA . . . the discretion and final authority to interpret and construe the terms of the Plan . . . ." (J.A. 329.)

In support, she cites two cases: *Vega v. National Life Insurance Services, Inc.*, 188 F.3d 287 (5th Cir. 1999) (*en banc*) and *Railey v. Cooperative Benefit Administrators, Inc.*, 2006 WL 1548968, *5-6 (W.D.Ky. June 5, 2006). We find both cases unpersuasive.

*Vega* involved an insurance company that utilized its wholly-owned subsidiary as a plan administrator. Although the record did not contain much information about the relationship between the companies, the Fifth Circuit reasoned that traditionally parent and subsidiary companies are more like single entities and, therefore, the subsidiary's decision to deny benefits "was, to some degree, self-interested." *Vega*, 188 F.3d at 301. The Court held that because the plaintiffs only demonstrated a minimal basis for a conflict and presented no evidence of the degree of the conflict, the appropriate review under the sliding scale approach would be to apply only a "modicum" less deference than they otherwise would. *Id.*

Similarly in *Railey*, where NRECA and CBA were defendants, the Court, relying on *Vega*, held that it was "not willing to ignore the *possibility* that CBA may have some incentive to decide in favor of its parent company, NRECA." *Railey*, 2006 WL 1548968 at *5-6 (emphasis added).[4] Despite not being able to identify any incentives CBA would have to deny claims, the Court termed NRECA's parent-subsidiary relationship an "inherent conflict." *Id.*

Courts have generally not considered the employer trust fund structure an "inherent conflict." *Post v. Hartford Ins. Co.*, 501 F.3d 154, 164 n.6 (3d Cir. 2007) (noting that when employee benefits are paid out a fully funded and segregated ERISA trust fund rather than an employers operating budget, no structural conflict of interest is created). Unlike an insurance company that insures and administers a plan, NRECA's trust fund structure removes the inherent incentive to

---

[4]Guthrie also cites an additional case where NRECA and CBA were defendants. *Martin v. Nat'l Rural Elec. Coop. Assoc. Group Benefit Program*, No. 8:03-cv-0640-t-26, (M.D. Fla. November 13, 2003). In *Martin*, the court stated that it previously ruled that the Plan documents, as well as the Declaration of Robert E. Alvin, showed no evidence of conflict of interest, or more specifically, financial stake in the outcome of Plaintiff's claim, on the part of CBA. *Id.* at 8.

deny claims because the funds do not come from NRECA or CBA's assets. *See Bedrick v. Travelers Ins. Co.*, 93 F.3d 149, 151 (4th Cir. 1996) (explaining the nature of the conflict as: "For a fixed premium from the employer, [the insurance company] both funds and administers the plan, so it bears the financial consequences - and reaps the financial rewards - of its own coverage decisions"). To the extent that CBA has discretion to avoid paying claims, there is no evidence that it thereby promotes the potential for its own or NRECA's profit.

We have recognized that "[t]here is a material difference [ ] between a corporation whose business profits primarily derive from managing ERISA plans and a corporation that collaterally manages a plan through which it chooses to provide its employees benefits." *Colucci*, 431 F.3d at 179. In *Colucci*, we held that "the simple and commonplace fact that a plan's administrator is also its funder is not enough to support a finding of a conflict of interest that would cause an adjustment to our deference." *Id.*

CBA and NRECA are independent third-parties that receive no financial or evaluative incentives for denying claims. By employing an independent third-party administrator and paying benefits from a trust fund, CBA avoids potential conflicts of interest. And, any "potential conflict" which Guthrie alludes to but fails to identify, does not establish a legally cognizable conflict of interest. Thus, we find that the district court properly applied the abuse of discretion standard of review.

## IV.

Under the abuse of discretion standard, an administrator's decision will be upheld if it is reasonable. *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 787 (4th Cir. 1995).

Put simply, CBA denied Guthrie's claim because she was physically and mentally capable of working a sedentary job. The crux of Guthrie's appeal is that CBA denied her a "full and fair review" by ignoring compelling evidence that she was limited by a number of physical and mental ailments in addition to occupational asthma.

She claims that CBA improperly relied on pulmonologists who did not adequately address her other health conditions, in violation of ERISA provisions, which require an administrator to "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." 29 C.F.R. § 2560.503-1(h)(3)(iii). Guthrie also argues there is ample evidence supporting her disability claim based on other conditions that CBA never considered. CBA contends that Guthrie's primary complaint was occupational asthma, and therefore it was not inappropriate to refer her claims to pulmonary specialists. More significantly, CBA asserts that Guthrie's other ailments were not the basis for her claim for LTD benefits. The district court found that all of Guthrie's arguments lacked merit and held that there was substantial evidence to deny her disability claim.

ERISA requires that plan administrators give plan participant appeals a "full and fair review" so that an administrator's decision is "the result of a deliberate, principled reasoning process" and "supported by substantial evidence." 29 U.S.C. § 1332(a); *Weaver v. Phoenix Home Life Mut. Ins. Co.*, 99 F.2d 154, 157 (4th Cir. 1993); *Stup v. Unum Life Ins. Co.*, 390 F.3d 301, 307 (4th Cir. 2004).

In assessing the reasonableness of an administrator's decision, we look to several non-exclusive factors. *Booth v. Wal-mart Stores, Inc. Assocs. Health and Welfare Plan*, 201 F.3d 335, 342-43 (4th Cir. 2000) (listing the factors to include: the language of the plan, whether the decision making process was reasoned and principled, and the adequacy of the materials considered to make the decision and the degree to which they support it). The dispositive factors, here, are whether CBA's decision was the result of a deliberate, principled reasoning process and supported by substantial evidence. *See Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.*, 32 F.3d 120, 126 (4th Cir. 1994) (stating that where the plan administrator offers a reasonable interpretation, courts may not disturb its findings).

Employing this standard, we find CBA's denial of benefits was unreasonable. Although initially CBA had substantial evidence that Guthrie could perform sedentary work, by 2003 CBA was on notice that Guthrie's other ailments were causing her health to deteriorate. On May 12, 2003, Dr. Goodman noted that Guthrie's medical prob-

lems were very significant and that she was suffering from "very prominent anxiety," depression, "is frequently tearful," and that "in some ways [Guthrie's] dermatological lesions were making her unemployable." (J.A. 77.) By the time CBA commenced its investigation on January 22, 2004, into whether Guthrie's LTD benefits would continue, she was already diagnosed by a clinical social worker, albeit not a psychologist, as suffering from major depression and anxiety. In response to the investigation, Dr. Goodman completed an attending physician statement on January 28, 2004. In the statement, he indicated that Guthrie's asthma, nerves, skin lesions, and arthritis all placed her in a Class 5 physical impairment category; that is, Guthrie's functional capacity was severely limited and she was incapable of minimal sedentary activity. Dr. Goodman also noted that she had developed very prominent anxiety symptoms. On February 27, 2004, Dr. Goodman reported that Guthrie's skin rash was so terrible that she had small infected boils in some areas. Despite these reports, CBA denied Guthrie LTD benefits on May 24, 2004.

And even after Dr. Goodman, in support of Guthrie's appeal, stated that her osteoarthritis, severe dermatitis, asthma with an occupational component, esophageal disease, hyperlipidemia, and hypertension rendered her disabled from any occupation, CBA claimed that her medical condition did not prevent her from returning to other gainful employment. In so deciding, CBA relied on Drs. Sonne's and Pearl's reports. Both pulmonologists found that Guthrie was not disabled based on her occupational asthma. Although Dr. Pearl noted that Guthrie had "multiple other problems," neither doctor addressed her other ailments.

Given that CBA was aware of the extent to which Guthrie's other ailments were disabling, we cannot conclude that CBA's reliance on the opinions of pulmonologists was reasonable. Under the circumstances, CBA should have referred Guthrie's appeal to an internist or primary care physician to assess her other ailments. Without question, CBA honed in on Guthrie's pulmonary issues, which effectively resulted in denying her claim based on occupational asthma alone. The record makes clear that on appeal the basis for Guthrie's claim for LTD benefits included far more than her occupational asthma. Moreover, the record is bereft of any evidence demonstrating that Guthrie's other ailments were not disabling. Thus, CBA's failure to

consider Guthrie's constellation of medical issues denied her a full and fair review and, consequently, its decision to deny benefits was not based on substantial evidence.

## V.

For the foregoing reasons, we reverse the judgment of the district court granting summary judgment in CBA's favor and remand for entry of judgment in Guthrie's favor.

*REVERSED AND REMANDED WITH INSTRUCTIONS*