JERRY E. SMITH, Circuit Judge:
Reliance Standard Life Insurance Company ("Reliance") appeals a judgment granting Juanita Nichols past and future long-term disability ("LTD") benefits. We reverse and render judgment for Reliance.
I.
Nichols worked for Peco Foods, Inc. ("Peco"), at a chicken processing plant in Sebastopol, Mississippi, as a Hazard Analysis Critical Control Point ("HACCP") Coordinator. Her job routinely exposed her to temperatures around forty degrees. She stopped working on January 28, 2016, stating that she had developed Raynaud's phenomenon, a circulatory disorder that could cause gangrene if she continued working in the cold.
Nichols sought benefits through Peco's long-term disability policy (the "policy" or "plan") issued by Reliance. That policy is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq ., and pays eligible claimants a percentage of their pre-disability earnings. A claimant is eligible if he is "Totally Disabled," meaning that he "cannot *806 perform the material duties of [the] Regular Occupation" he was performing when total disability began.[1] The policy defines "Regular Occupation" as the way the claimant's job "is normally performed in the national economy" and not the way it is "performed for a specific employer or in a specific locale."[2]
When Nichols applied for LTD benefits, Reliance considered whether exposure to the cold was a material duty of her regular occupation. Reliance engaged Matthew Bolks, a vocational rehabilitation specialist, to determine Nichols's regular occupation. Bolks reviewed the application-which described Nichols's job components as HACCP, Sanitarian Standard Operating Procedures ("SSOP"), and Good Manufacturing Practices Procedures for the plant-and a submission from Peco that confirmed Nichols's job title as HACCP Coordinator and listed her job duties. That list did not specify that Nichols was required to work in the cold. Comparing Nichols's application and the Peco job duties with the Department of Labor's Dictionary of Occupational Titles ("DOT"), Bolks concluded that Nichols's regular occupation was "Sanitarian." The material duties of the occupation of sanitarian, as defined by the DOT, include neither employment at a poultry processing facility nor exposure to the cold.
After Bolks's assessment, Reliance denied Nichols's application for LTD benefits via letter, explaining that she "retain[ed] the ability to perform the material[ ] duties of [her] occupation." Reliance acknowledged that Nichols could not be exposed to cold temperatures and that her job for Peco required her to work in cold areas. But it determined that her regular occupation of sanitarian, "as it is typically performed in the national economy," did not require working in the cold. "[A]ny requirements regarding work in a cold environment," Reliance elaborated, were "job-site specific." Reliance concluded that Nichols was not "precluded from performing [her] regular occupation" and thus did not meet the policy's definition of "Totally Disabled."
Reliance's letter told Nichols that she had the right to appeal, and she timely did, emphasizing that her condition "prohibited [her] from working in cold environments," as required by her "regular job duties as HACCP Coordinator." She did not contend that an alternative DOT entry would encompass her job duties better than did the sanitarian entry.
During its appellate review, Reliance engaged Sharon Xu, M.D., independently to assess Nichols's physical capabilities. Xu determined that Nichols "ha[d] much less of a physical capacity limitation and more of an environmental limitation." "In the proper work environment," Xu continued, "[Nichols] should be able to perform all activities ... [but] this would be in an environment where there [are] normal room temperatures and not one with exposures to cold temperatures." Xu found, however, that Nichols "suffer[ed] from a significant impairment when exposed to the cold environment as part of the regular duties of her job."
*807 Reliance consulted a second vocational review specialist, Jody Barach, who confirmed that Nichols's job at Peco fell within the "regular occupation" of sanitarian as defined by the DOT. Barach noted the environmental limitations that Xu had identified but concluded that Nichols's "physical restrictions ... [we]re consistent with the physical demands of a Sanitarian. Any exposure to cold temperatures would be job-site specific." Thus, Barach summarized, "there [we]re no restrictions or limitations that would preclude Ms. Nichols from performing her Regular Occupation." Reliance accordingly affirmed the denial of LTD benefits, explaining to Nichols "that while [she was] limited in [her] ability to work in colder temperatures, this [wa]s a condition specific to Peco Foods, Inc., and not [her] occupation as a Sanitarian."
II.
Nichols sued Reliance under ERISA, seeking to "recover [LTD] benefits due," 29 U.S.C. § 1132(a)(1)(B), and contending that Reliance had abused its discretion in denying them because she "was clearly unable to perform the essential duties of her occupation." Reliance moved for summary judgment. In less than two pages of substantive response, Nichols urged the district court to "take judicial notice" that the facilities where chicken is processed must be kept cold. She also averred that she was entitled to benefits because "a HACCP Coordinator in any chicken processing facility around the world is going to have to work in cold environments."
To decide the motion, the district court focused on "[1] whether Reliance's denial was supported by substantial evidence, and [2] whether Reliance has a conflict of interest." Nichols v. Reliance Stand. Life Ins. Co. , No. 3:17-CV-42-CWR-FKB, 2018 WL 3213618, at *3 (S.D. Miss. June 29, 2018). Regarding the first factor, the court held that Reliance's determination "that exposure to cold temperatures was not among the 'material duties' of Nichols' 'regular occupation' ... is not based on a fair estimate of the record evidence." Id. at *4. The court opined that "Nichols' specific job duties, as described by [Peco], fell into three categories." Id. "[W]herever Nichols' job was performed in the national economy," the court explained, "it would require her to perform [1] sanitary-training duties, [2] meat inspection duties, and [3] meat packaging duties." Id. (emphasis added).
Reliance thus erred, the district court continued, by defining Nichols's regular occupation based only on her sanitary-training duties. Id. Noting that a different DOT title-"Cooler Room Worker (Meat Products)"-"best captures Nichols' meat inspection and packaging duties," the court found that work in the cold was a material duty of Nichols's regular occupation. Id. at *4-5 (quotation at *4). It concluded that Reliance's denial of benefits "was unsupported by any evidence, let alone substantial evidence." Id . at *5 (emphasis added).
The district court next observed that the existence of a conflict stemming from an insurer's role as issuer and administrator is an important factor in reviewing for abuse of discretion, particularly "when there is evidence that an insurer has a 'history of biased claims administration.' " Id. at *6 (quoting Metro. Life Ins. Co. v. Glenn , 554 U.S. 105, 117, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008) ). The court thus "conducted a cumbersome review of judicial opinions addressing Reliance's behavior in disability cases" and found "over 60 opinions reversing a decision [of Reliance's] as an abuse of discretion." Id. ; see also ids="3677099" index="7" url="https://cite.case.law/us/554/105/#p117">id. at *6 n.79 (collecting citations). Those cases demonstrated that "[c]ourts in every federal circuit have repeatedly criticized [Reliance's] claims management practices." Id. at *8. The district court *808 specifically found that "Reliance has been admonished for reflexively using [DOT] while having clearly ignored the actual duties of a claimant's job." Id. (cleaned up).[3]
The district court summarized that "[t]he fact that Reliance's decision to deny Nichols benefits was devoid of evidentiary support is enough to prove that the decision was an abuse of discretion," but "Reliance's long past of biased and wrongful claims denials in defiance of countless judicial warnings ... simply underscores this conclusion." Id. at *9. The court consequently denied the motion for summary judgment, reversed "[Reliance's] decision to deny Nichols benefits," and ordered Reliance to pay Nichols both past and future benefits and "a reasonable attorney's fee." Id. at *9-10.
III.
We review a summary judgment de novo , "applying the same legal standards that controlled the district court's decision." White v. Life Ins. Co. of N. Am. , 892 F.3d 762, 767 (5th Cir. 2018). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).
"When an ERISA plan lawfully delegates discretionary authority to the plan administrator, a court reviewing the denial of a claim is limited to assessing whether the administrator abused that discretion." Ariana M. v. Humana Health Plan of Tex., Inc. , 884 F.3d 246, 247 (5th Cir. 2018) (en banc) (citing Firestone Tire & Rubber Co. v. Bruch , 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) ). The plan gives Reliance such discretion, so we review its denial of Nichols's claim for abuse of discretion.[4] "An ERISA claimant bears the burden to show that the administrator abused its discretion." George v. Reliance Stand. Life Ins. Co. , 776 F.3d 349, 352 (5th Cir. 2015).
"A plan administrator abuses its discretion where the decision is not based on evidence, even if disputable, that clearly supports the basis for its denial." Holland v. Int'l Paper Co. Ret. Plan , 576 F.3d 240, 246 (5th Cir. 2009) (cleaned up). "If the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail." Killen v. Reliance Stand. Life Ins. Co. , 776 F.3d 303, 307 (5th Cir. 2015) (citation omitted). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Ellis v. Liberty Life Assur. Co. of Bos. , 394 F.3d 262, 273 (5th Cir. 2004) (cleaned up). "A decision is arbitrary only if made without a rational connection between the known facts and the decision or between the found facts and the evidence." Foster v. Principal Life Ins. Co. , 920 F.3d 298, 304 (5th Cir. 2019) (citation omitted). In other words, we must uphold the determination if our review "assure[s] that the administrator's decision fall[s] somewhere on a continuum of reasonableness-even if on the low end." Holland , 576 F.3d at 247 (citation omitted).
We weigh "several different considerations ... before determining whether a plan administrator abused its discretion."
*809 White , 892 F.3d at 767 (cleaned up). Which considerations apply is "case-specific." Id. (citation omitted). The parties dispute whether Reliance's decision was supported by substantial evidence and whether the denial was affected by a conflict of interest.
IV.
Reliance contends that its decision that working in cold areas was not a material duty of Nichols's regular occupation is supported by substantial evidence. The district court disagreed, finding that Reliance's decision "was unsupported by any evidence, let alone substantial evidence," because Reliance did not account for Nichols's job duties outside the DOT description of what a sanitarian does. Nichols , 2018 WL 3213618, at *5. But our precedent does not require that an administrator consider each of a claimant's job duties to determine his regular occupation. And in any event, Reliance's classification was easily based on substantial evidence.
A.
In House v. American United Life Insurance Co. , 499 F.3d 443, 453 (5th Cir. 2007), we defined "regular occupation" in an LTD plan as "a general occupation rather than a particular position with a particular employer."[5] We explained that a claimant's regular occupation must be defined at a high level of generality, "referencing the activities that constitute the material duties of [the claimant's occupation] as they are found in the general economy." Id . at 454. We elaborated that it was "too fine" a distinction to categorize the claimant's regular occupation as "trial lawyer" instead of "lawyer." Id . at 453. To the contrary, the claimant's " 'regular occupation' was as an attorney, not restricted to his own specific job as a litigation attorney with a uniquely stressful practice, but rather referencing the activities that constitute the material duties of an attorney as they are found in the general economy." Id . at 454 (emphasis added). House thus suggests that features of a claimant's job within a general type of work (for example, the unique features of working as a trial attorney) are irrelevant to defining the material duties of a claimant's regular occupation (attorney).
House did not address whether and how a plan administrator may use the DOT to determine the material duties of a claimant's regular occupation. But we had already done so in Robinson v. Aetna Life Insurance Co. , 443 F.3d 389 (5th Cir. 2006), and Pylant v. Hartford Life & Accident Insurance Co. , 497 F.3d 536 (5th Cir. 2007). In Robinson , we indicated that DOT entries may serve as evidence of material duties of a claimant's regular occupation if they are in the administrative record.[6] And in Pylant , 497 F.3d at 540, we held that a plan administrator need not account for each of a claimant's job duties when using the DOT to identify the duties of a claimant's regular occupation as found in the general economy.
Pylant is especially pertinent. There, the claimant objected to the administrator's use of the DOT to define the clause "your occupation" in the relevant LTD plan. Id. at 539-40. She maintained that by using the DOT, the administrator had found "the essential duties of her occupation [to be] lesser than those she actually *810 performed" and had thus abused its discretion in denying benefits. Id . at 540. We disagreed, explaining that administrators may use the DOT to determine material duties of a claimant's occupation "because insurers issuing disability policies cannot be expected to anticipate every assignment an employer might place upon an employee outside the usual requirements of his or her occupation." Id. (cleaned up). We thus held that the administrator's interpretation of the material duties of a claimant's occupation based on the DOT was "fair and reasonable," even though the essential duties identified did not match each duty actually performed. Id.
B.
Reliance's finding that work in cold areas was not a material duty of Nichols's regular occupation, and Reliance's consequent decision to deny Nichols LTD benefits, are supported by substantial evidence. Reliance submitted reports from two vocational review specialists who used DOT to determine that Nichols's regular occupation was that of sanitarian. Taking the facts in the light most favorable to Nichols, Reliance's conclusion that Nichols's regular occupation is sanitarian was "fair and reasonable": The duties of HACCP Coordinator at Peco substantially match the material duties of a sanitarian. See Pylant , 497 F.3d at 540.[7]
Throughout her administrative appeal and this ERISA action, Nichols has stressed that the sanitarian entry does not capture her "job duties as HACCP Coordinator," which, she posits, require "working in cold environments." She faults Reliance for basing its classification on vocational reviews instead of "talking to [her] to determine her normal job duties." She emphasizes that her job required her to inspect chicken for "[p]rocessing defects," which meant she had to work in cold conditions because Peco "is required by [federal regulatory] law to keep [processed] poultry at cold temperatures." Nichols also affirms the district court's declaration that "[c]ommon sense says that an occupation involving inspection and packaging of meat products would require exposure to refrigeration and low temperatures." Nichols , 2018 WL 3213618, at *4. Working in the cold, Nichols concludes, "is a material duty ... for any HACCP coordinator in any chicken processing facility in the nation."
Those objections miss the mark. Accepting Nichols's factual contentions as true, any requirement to work in the cold is specific to a subset of sanitarians who work in poultry processing plants. In other *811 words, the requirement that Nichols worked in the cold was specific to her "particular position with a particular employer." House , 499 F.3d at 453. It is not part of her "regular occupation" as defined by the plan and our precedent. Under House , we may not determine the material duties of Nichols's regular occupation by differentiating between sanitarians generally-who might work at a variety of food processing plants-and a sanitarian who works at a poultry processing plant.
Nichols similarly contends that Burtch v. Hartford Life & Accident Insurance Co. , 314 F. App'x 750 (5th Cir. 2009) (per curiam), and Robinson -which Burtch cites at length-require "an insurer [to] look to all the duties an employee performs as described by the employer" to decide a claimant's regular occupation. Nichols insists that Reliance should have considered the environmental factors of her HACCP Coordinator job because the sanitarian designation fails to account for them. The district court also relied on Burtch , asserting that "the Fifth Circuit says insurers must review the 'specific duties of the employee's job, as described by the employer' " to determine a claimant's regular occupation. Nichols , 2018 WL 3213618, at *4 (quoting Burtch , 314 F. App'x at 755 ).
Although Burtch and Robinson recognize that a claimant's particular duties may "well illustrate" the claimant's material job duties, those decisions emphasize that a claimant's "precise duties do not define her regular occupation." Robinson , 443 F.3d at 396 (emphasis and citation omitted). And neither of those cases requires an administrator to account for each of a claimant's specific job duties. In fact, House stands for the contrary, indicating that courts should not distinguish between different types of similar work based on factors "unique[ ]" to the claimant's job. See House , 499 F.3d at 454.[8]
Nichols also insists that Reliance erred in using only one DOT entry to define the material duties of her regular occupation instead of a different entry or even multiple entries. She challenges the designation of sanitarian, contending that none of its material duties accounts for the HACCP Coordinator task of "packaging and exporting meat products."[9] She also adopts the district court's view that her "job duties can be placed into three categories," and the sanitarian label covers only one. Nichols ultimately propounds the district court's conclusion that the DOT "definition of Cooler Room Worker (Meat Products) would more closely fit her job duties" and that Reliance abused its discretion by classifying her regular occupation differently.
But the "Cooler Room Worker (Meat Products)" entry is not in the administrative record. The district court *812 raised it sua sponte , and Nichols presses it for the first time on appeal. In Robinson , 443 F.3d at 396, we rejected a party's attempt to rely "on DOT information outside the administrative record," and we likewise disregard the "Cooler Room Worker (Meat Products)" entry here.[10]
Reliance did not need to account for every task Nichols performed as HACCP Coordinator when assessing her regular occupation as defined by the plan. Reliance merely needed to make a "fair and reasonable" determination of whether Nichols's disability precluded her from performing the material duties of her regular occupation.[11] Though the occupation of sanitarian does not account for whatever meat packaging duties the job of HACCP Coordinator involved, Reliance's determination was at least "based on evidence, even if disputable, that clearly supports the basis for its denial." Holland , 576 F.3d at 246 (citation omitted).[12]
*813 V.
Reliance also contends that the conflict of interest inherent to its role as plan insurer and administrator did not affect its decision to deny benefits. And in any event, Reliance avers that because Nichols offered no evidence that the conflict influenced its determination, the conflict should not be a significant factor in our review. We agree. There is no evidence that Reliance's conflict rendered its finding arbitrary or capricious, and the existence of the conflict does not overcome the substantial evidence supporting Reliance's decision.
A.
We presume a structural conflict of interest where "the insurer of the plan also determines whether the claimant is entitled to benefits," White , 892 F.3d at 767 (citing Glenn , 554 U.S. at 108, 128 S.Ct. 2343 ), because the insurer "potentially benefits from every denied claim," Schexnayder v. Hartford Life & Accident Ins. Co. , 600 F.3d 465, 470 (5th Cir. 2010) (citation omitted). A conflict is one "of several different considerations," Glenn , 554 U.S. at 117, 128 S.Ct. 2343, that "must be weighed as a factor in determining whether there is an abuse of discretion," ids="3677099" index="45" url="https://cite.case.law/us/554/105/#p117">id. at 111, 128 S.Ct. 2343 (cleaned up).
We weigh the conflict "depending upon the circumstances of a particular case." Schexnayder , 600 F.3d at 470. A structural conflict may "prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision," such as "where an ... administrator has a history of biased claims administration," Glenn , 554 U.S. at 117, 128 S.Ct. 2343, or where "circumstances surrounding the plan administrator's decision suggest procedural unreasonableness," Truitt v. Unum Life Ins. Co. of Am. , 729 F.3d 497, 509 (5th Cir. 2013) (internal quotation marks and citation omitted).
But a structural conflict may also "prove less important (perhaps to the vanishing point)" in some cases. Glenn , 554 U.S. at 117, 128 S.Ct. 2343. For example, where there is substantial evidence supporting the denial of benefits, the impact of a structural conflict may be "clearly outweighed" and should not be emphasized. Truitt , 729 F.3d at 515 (citation omitted). Additionally, "any conflict of interest is not a significant factor" if a claimant fails to "come forward with any evidence that [the administrator's] conflict of interest influenced its benefits decision." Anderson v. Cytec Indus., Inc. , 619 F.3d 505, 512 (5th Cir. 2010) (per curiam).[13] That is because it is the plaintiff's burden to show that the administrator abused its discretion, see George , 776 F.3d at 352, and "not the defendant's burden to prove its decision was not tainted by self-interest," Doyle v. Liberty Life Assurance Co. of Bos. , 542 F.3d 1352, 1360 (11th Cir. 2008).
Thus, we typically consider an administrator's history of biased claims administration only if the claimant offers evidence of such a history. In Holland , for instance, after noting that the administrator had taken multiple "steps to minimize any conflict," we stressed that the claimant "adduced no evidence ... that [the administrator's] conflict affected its benefits decision or that it ha[d] a history of abuses of *814 discretion." Holland , 576 F.3d at 249. We did not fish for evidence of past abuses but relied on the claimant to produce it. And, since Holland , we have consistently looked to the evidence brought by the claimant, and not our own findings or those of the district court, to assess the import of the administrator's conflict.[14]
B.
Nichols has never suggested that Reliance's structural conflict impacted its decision to deny her LTD benefits.[15] The district court raised the conflict for the first time, conducting extensive research and presenting "an unmitigated pattern of arbitrary and wrongful behavior by Reliance" without seeking input from the parties or giving Reliance a chance to respond. Nichols , 2018 WL 3213618, at *9. The court insisted that the lack of substantial evidence supporting Reliance's decision was enough to establish an abuse of discretion. See index="58" url="https://cite.case.law/citations/?q=2018%20WL%203213618">id. But its protracted analysis of the conflict suggests otherwise.
The court allegedly uncovered "a decades-long pattern of arbitrary claim denials and other misdeeds, a pattern [that it] must take into account when assessing Reliance's actions in this case." Id . at *1 (emphasis added). It "found over 100 opinions in the last 21 years criticizing Reliance's disability decisions" but examined only the "60 opinions reversing a decision as an abuse of discretion or as arbitrary and capricious." Id. at *6. To justify its exposé, the court invoked Glenn 's language "that a conflict of interest 'should prove more important' when 'circumstances suggest a higher likelihood that it affected the benefits decision.' " Id . (quoting Glenn , 554 U.S. at 117, 128 S.Ct. 2343 ).
The district court erred in emphasizing Reliance's structural conflict. The court's extensive sua sponte review eschewed our repeated holdings that a structural conflict is not a significant factor where the claimant offers no evidence that the conflict impacted the administrator's decision. See Anderson , 619 F.3d at 512 ; Holland , 576 F.3d at 249.[16] Moreover, to portray "an unmitigated pattern of arbitrary and wrongful behavior by Reliance," the court ignored the forty cases upholding Reliance's decisions. And it presented that alleged pattern without input from either party.[17]
Our precedent dictates that because Nichols "adduced no evidence ... that *815 [Reliance's] conflict affected its benefits decision or that it has a history of abuses of discretion," Reliance's structural conflict should not be given significant weight. Holland , 576 F.3d at 249.[18] Accordingly, "considering the potential conflict of interest as a minimal factor," id . at 251, it is "clearly outweighed by the substantial evidence supporting [Reliance's] decision," Truitt , 729 F.3d at 515 (citation omitted).
The judgment awarding Nichols past and future LTD benefits is REVERSED, and a judgment of dismissal with prejudice is RENDERED for Reliance.

For Nichols's class of employees (Class 1), the policy fully defines "Totally Disabled" and "Total Disability" to "mean, that as a result of an Injury or Sickness, during the Elimination Period and thereafter an Insured cannot perform the material duties of his/her Regular Occupation."

The full definition provides that " 'Regular Occupation' means the occupation the Insured is routinely performing when Total Disability begins. [Reliance] will look at the Insured's occupation as it is normally performed in the national economy, and not the unique duties performed for a specific employer or in a specific locale."

The district court found about forty cases upholding Reliance's decisions but did not discuss them.

Nichols contends that the denial of benefits should be reviewed de novo under Ariana M. That is incorrect. We review a denial de novo only "[f]or plans that do not have valid delegation clauses." Ariana M. , 884 F.3d at 247.

Reliance contends that our definition is "close if not identical" to the definition in the LTD policy at issue here.

See Robinson , 443 F.3d at 395-96 (noting that though the insurer relied on DOT information to establish the "material duties of an occupation," DOT evidence was not in the record (internal quotation marks omitted)).

For instance, Nichols's job of HACCP Coordinator required her to (1) "[h]elp train quality assurance employees ... in all aspects of HACCP, SSOP's, and all regulatory paperwork"; (2) "[m]aintain[ ] daily paperwork in an organized manner" and "[r]eview[ ] the necessary reports and forms to comply with all government regulations and company policies"; (3) "[p]hysically inspect products for both natural occurring [sic] and processing defects"; and (4) "[m]ake[ ] changes to HACCP and SSOP program at the direction of the Quality Assurance Manager or the Corporate Director Quality Assurance." Material duties in the DOT sanitarian definition closely track those job duties: (1) "[d]irect[ ] food handlers and production personnel in sanitary and pest control procedures"; (2) "[c]ompile[ ] required reports regarding regular inspections, sanitation violations, and steps taken to resolve deficiencies"; (3) "[e]xamine[ ] incoming shipments of food ingredients for foreign matter, such as insects, poison, or dirt" and "[i]nspect[ ] products and equipment for conformity to federal and state sanitation laws and plant standards"; and (4) "[c]onfer[ ] with management and production personnel on sanitation problems, and recommend[ ] changes in equipment, plant layout, lighting, ventilation, or work practices to improve sanitation standards and purity of product." The similarities continue across Nichols's other job duties at Peco.

Burtch and Robinson , moreover, focused on the claimant's particular job duties because that was the only evidence of the material duties of the claimant's occupation in those respective administrative records. See Burtch , 314 F. App'x at 755 (observing that the insurer relied solely on the list of the claimant's job duties to establish the essential duties of his occupation); Robinson , 443 F.3d at 396 (noting that the administrative record reflected that the claimant had to drive hundreds of miles each week for his job, and there was no evidence suggesting that driving was not a material duty of his occupation). Here, the DOT entry for sanitarian is in the record, it closely tracks the Peco job description, and neither it nor the job description suggests that Nichols's occupation requires her to work in the cold.

Exactly what Nichols's "meat packaging duties" required is unclear, because the job description for HACCP Coordinator explains only that the employee must "[f]ollow the written specification for packaging and labeling of products."

Nichols rejoins that because the sanitarian DOT entry was in the administrative record, she was free to raise any other DOT entry. That is not supported by Robinson , which holds that a "DOT entry is evidence that addresses a 'factual question' " and suggests that determining the material duties of an occupation using DOT is "a finding of fact." 443 F.3d at 394. Nichols's theory that the entire dictionary becomes factual evidence, even when the plan administrator makes its determinations according to one entry, does not square with Robinson 's focus on the specific DOT evidence available before the administrator when it made factual findings. Similarly, "[a] long line of Fifth Circuit cases stands for the proposition that, when assessing factual questions, the district court is constrained to the evidence before the plan administrator." Vega v. Nat'l Life Ins. Servs., Inc. , 188 F.3d 287, 299 (5th Cir. 1999) (en banc), overruled on other grounds by Glenn , 554 U.S. 105, 128 S.Ct. 2343. The district court was thus constrained to the DOT entry in the administrative record.

See Pylant , 497 F.3d at 540 ; see also House , 499 F.3d at 454 (emphasizing that the definition of a claimant's "regular occupation" should not be "restricted to his own specific job" and its "unique[ ]" features). The district court failed to identify binding precedent supporting its assertion that it was "unreasonable" for Reliance's vocational experts "to define occupational duties by relying exclusively on a single Dictionary Title." Nichols , 2018 WL 3213618, at *5 (cleaned up).
The district court cited instead, inter alia , Lasser v. Reliance Standard Life Insurance Co. , 344 F.3d 381, 387 n.5 (3d Cir. 2003), and Kinstler v. First Reliance Life Insurance Co. , 181 F.3d 243, 253 (2d Cir. 1999). But our definition of "regular occupation" established in House is different from the definition endorsed by the Second and Third Circuits. Compare Lasser , 344 F.3d at 386 (" '[R]egular occupation' is the usual work that the insured is actually performing immediately before the onset of disability."), and Kinstler , 181 F.3d at 252 (defining regular occupation as "a position of the same general character as the insured's previous job, requiring similar skills and training, and involving comparable duties" (citation omitted)), with House , 499 F.3d at 453 (defining regular occupation as "a general occupation rather than a particular position with a particular employer"). See also Darvell v. Life Ins. Co. of N. Am. , 597 F.3d 929, 935-36 (8th Cir. 2010) (observing that "[t]he circuits are split" on whether to define regular occupation based on the "claimant's actual job duties" or "the insured's occupation as it is performed in a typical work setting in the general economy"). No matter what other circuits require, our precedent dictates that regular occupation is to be defined generally and need not account for each of a claimant's unique job duties.

The district court opined that Reliance's vocational review specialists "cite[d] no support for the claim that Nichols's occupational duties were identical to those of 'Sanitarian (Any Industry).' " Nichols , 2018 WL 3213618, at *5 (emphasis added) (citation omitted). But Bolks referred to the list of Nichols's job duties at Peco and compared them to the DOT sanitarian entry, concluding that the sanitarian occupation "represent[ed] the best available DOT based occupational designation," and Barach apparently reviewed Bolks's report. Cursory as those analyses may be, courts must uphold decisions "based on evidence, even if disputable, that clearly supports the basis for its denial." Holland , 576 F.3d at 246 (citation omitted). And there is such evidence here, as we have shown.

See also McDonald v. Hartford Life Grp. Ins. Co. , 361 F. App'x 599, 608 (5th Cir. 2010) (per curiam) ("If claimants do not present evidence of the degree of the conflict, the court will generally find that any conflict is not a significant factor." (internal quotation marks and citation omitted)).

See, e.g. , Hagen v. Aetna Ins. Co ., 808 F.3d 1022, 1029 (5th Cir. 2015) (refusing to give "great[ ] weight" to a conflict because the claimant presented "insufficient" evidence to establish a history of biased claims administration); McDonald , 361 F. App'x at 608-09 (finding that a structural conflict was not a significant factor because the claimant had "not pointed to any specific evidence of a history of abuses of discretion or of how [the administrator's] structural conflict of interest may have affected its benefits decision in this particular case," nor had the claimant "attempted to conduct discovery on any potential conflicts of interest"). Similarly, in Truitt , we considered evidence of the administrator's history of biased claims administration because claimants had offered that evidence. See Truitt , 729 F.3d at 514 ; Brief of Appellant at 28, Truitt , 729 F.3d 497 (No. 12-50142) (explaining that claimants cited decisions in which other courts had criticized the administrator for its handling of claims).

Even on appeal, Nichols discussed the conflict in only one paragraph of her brief, making no attempt to show that it affected Reliance's decision but observing that the district court found it "very important."

See also Schexnayder , 600 F.3d at 470 (noting that although a structural conflict is one factor that courts "must consider," "[t]he weight that [a] conflict will have ... changes, however, depending upon the circumstances of a particular case").

Based on Chief Justice Robert's concurring opinion in Glenn , the district court insisted that it should consider an administrator's history of biased claims decisions by looking to "a pattern or practice of unreasonably denying meritorious claims." Nichols , 2018 WL 3213618, at *6 (citing Glenn , 554 U.S. at 123, 128 S.Ct. 2343 (Roberts, C.J., concurring in part and concurring in the judgment)). But the Chief Justice stated merely that the kind of "evidence demonstrat[ing] that the conflict actually motivated or influenced the claims decision ... may take many forms," and he pointed to "a pattern or practice of unreasonably denying meritorious claims" as the sort of evidence that would be relevant. Id. The Chief Justice did not suggest that a reviewing court must conduct its own "cumbersome" review if the parties have not offered such evidence.

That is the correct approach even though Reliance does not contend that it has taken steps to reduce the chance that its conflict affects benefits decisions. See Hagen , 808 F.3d at 1030 (holding that though there are steps "that an insurer can take to reduce its potential bias, there is no requirement that an insurer do so" and that "[a]bsent other evidence suggesting procedural unreasonableness or warranting treatment of the conflict as a more significant factor, the mere fact that [the insurer] did not utilize any such precautions is not sufficient to justify giving [its] conflict greater weight").